**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SKT2, LLC, d/b/a KÄGWERKS,**<br>*Plaintiff*,<br>v.<br>**RIVET INDUSTRIES, INC. and ROBERT H. LUKE,**<br>*Defendants*. | Case No. 25-cv-3904 (TSC) |

**MEMORANDUM OPINION**

Plaintiff SKT2, LLC, which operates as Kägwerks, brings this action against Rivet Industries, Inc. and its employee, Robert Luke, alleging that they misappropriated Plaintiff's confidential information to develop a competing product. Plaintiff brings seven claims: (I) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, 1839, and the District of Columbia Uniform Trade Secrets Act ("DCUTSA"), D.C. Code § 36-401, *et seq.*; (II) breach of contract; (III) breach of the implied covenant of good faith and fair dealing; (IV) fraud; (V) tortious interference with prospective business advantage; (VI) tortious interference with contract; and (VII) civil conspiracy. Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the court will GRANT IN PART and DENY IN PART Rivet's motion and DENY Luke's motion.

## I. BACKGROUND

Plaintiff develops wearable communications equipment for soldiers in combat. Am. Compl. ¶¶ 2, 13, ECF No. 1. Its Dismounted Operator's Combat Kit ("D.O.C.K."), D.O.C.K. Lite, D.O.C.K. Radio, and D.O.C.K. Ultra combine hardware and software in a vest-mounted

system that connects a body-worn computing or radio device to an operator's display. *Id.* ¶¶ 3, 13, 60. Plaintiff holds U.S. Patent No. 12,212,354, titled "Methods and Apparatus for a Wearable Command Center," and has a second patent application pending. *Id.* ¶ 14. The U.S. Army's Program Executive Office Soldier ("PEO"), the office responsible for prototyping, procuring, and fielding soldier equipment, selected Plaintiff's D.O.C.K. solution as the preferred wearable computing platform for two of its programs: Nett Warrior and the Product Manager Integrated Visual Augmentation System ("PdM IVAS"), now known as Soldier Borne Mission Command ("SBMC"). *Id.* ¶ 15. Luke was a civilian employee within PEO from August 2018 to April 2025, helping develop the roadmap and engineering requirements for the PdM IVAS/SBMC program. *Id.* ¶¶ 19, 20.

Under an earlier phase of the PdM IVAS/SBMC program, Rivet received orders from a third-party contractor and placed sub-orders with Plaintiff. *Id.* ¶ 21. Plaintiff and Rivet executed a mutual Non-Disclosure Agreement ("NDA") in September 2024, after Rivet's CEO represented that the company would not build a competing product. *Id.* ¶¶ 22, 25, 27. The NDA limited each party's use of the other's confidential information to "evaluating or pursuing a business relationship between the parties." *Id.* ¶ 28; Pl.'s Ex. A (NDA), ECF No. 1-2. The parties agreed that the other's software, hardware, prototypes, and samples contained confidential information, and that they would not "modify, reverse engineer, decompile, create other works from, or disassemble" those materials without consent. Am. Compl. ¶ 30; NDA § 18. In October 2024, Plaintiff provided Rivet confidential samples of its D.O.C.K. Ultra solution and related nonpublic specifications to evaluate a potential collaboration. Am. Compl. ¶ 34.

Plaintiff alleges that Defendants had in fact been planning to develop a Rivet-branded chest-mounted computing and communications system to compete with Plaintiff's D.O.C.K.

solutions. *Id.* ¶¶ 4–5, 35–36. While still employed at PEO, Luke allegedly told Rivet that, to compete in PEO programs, it would need to create a solution that mimicked Plaintiff's technology. *Id.* ¶ 37. In 2024 and early 2025, Luke led meetings reviewing the specifications and features of Plaintiff's solutions and advised Rivet on how to avoid infringing Plaintiff's patent. *Id.* ¶ 38. Plaintiff alleges that Rivet then reverse engineered the D.O.C.K. Ultra sample to create a competing system. *Id.* ¶¶ 35, 71.

Luke left PEO in April 2025 and joined Rivet the following month. *Id.* ¶¶ 40–41. In May 2025, Rivet began promoting its own vest-mounted communications docking system. *Id.* ¶ 43. In August 2025, Rivet obtained $55 million in military funding and, in September 2025, a separate agreement for nearly $200 million. *Id.* ¶¶ 39, 46. Plaintiff notified Rivet that it was investigating suspected misappropriation; Rivet's counsel denied any improper use of Plaintiff's confidential information or development of a competing solution, characterizing the promotional images as "3D mock-up[s]" produced at the Army's request rather than an active product. *Id.* ¶¶ 47–51.

Plaintiff filed this action in Superior Court, and Defendants removed the case to this court in November 2025. Notice of Removal, ECF No. 1. Rivet moves to dismiss Counts I, III, IV, V, and VII. Rivet's Mot. to Dismiss ("Rivet's Mot.") at 1, ECF No. 19. Luke moves to dismiss Counts I, V, VI, and VII and incorporates Rivet's arguments as to overlapping claims. Luke's Mot. to Dismiss ("Luke's Mot.") at 1–2, ECF No. 20.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must "accept the plaintiff's factual allegations as true and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (cleaned up). The court need not, however, accept "inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint" or "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). In resolving a Rule 12(b)(6) motion, the court may consider "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

Fraud claims are subject to a heightened pleading standard requiring a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A plaintiff satisfies that standard by pleading "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *Kowal*, 16 F.3d at 1278). The rule ensures that defendants have notice sufficient to "defend against the charge and not just deny that they have done anything wrong." *Id.* at 1259 (citation omitted).

## III. ANALYSIS

### A. Choice of Law

The parties agree that, under the NDA's choice-of-law provision, Delaware law governs Plaintiff's contract and implied-covenant claims. Rivet contends that the provision reaches Plaintiff's tort claims as well, Rivet's Mot. at 6 n.5, while Plaintiff argues that it stops at the contract claims, leaving D.C. law to govern the rest, Pl.'s Opp'n at 2, 12–14, ECF No. 25. Luke,

who is not a party to the NDA, maintains that D.C. law governs all claims against him. Luke's Mot. at 8 n.2. The court concludes that Delaware law governs Counts IV, V, and VII as asserted against Rivet, and that D.C. law governs all claims against Luke. The parties apply federal and D.C. law to Count I and agree that Delaware law governs Count III. *See* Rivet's Mot. at 6–10; Luke's Mot. at 6–8; Pl.'s Opp'n at 7–11.

"When, as here, deciding state-law claims under supplemental jurisdiction, the court applies the choice-of-law principles of the forum jurisdiction, which in this case is the District of Columbia." *Jin v. Ministry of State Sec.*, 254 F. Supp. 2d 61, 68 (D.D.C. 2003). "Under District of Columbia law, courts will give effect to a contractual choice of law clause as long as there is some reasonable relationship with the state specified." *Murphy v. LivingSocial, Inc.*, 931 F. Supp. 2d 21, 25 (D.D.C. 2013). But such a provision "does not necessarily bind parties with respect to non-contractual causes of action." *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 27 (D.D.C. 2019). Whether a choice-of-law provision governs non-contractual claims turns on the parties' intent, as evidenced by the contract's language. *See Azima v. RAK Inv. Auth.*, 926 F.3d 870, 876–79 (D.C. Cir. 2019).

The NDA provides that "[t]his Agreement and any action related thereto will be governed, controlled, interpreted, and defined by" Delaware law. NDA § 11. Rivet's incorporation in Delaware supplies the reasonable relationship that makes the provision enforceable. *See Gray v. Am. Express Co.*, 743 F.2d 10, 17 (D.C. Cir. 1984). Because the parties chose Delaware law to govern the NDA's interpretation, the court applies Delaware's rules of construction to determine the scope of the provision. "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). "[A] broad choice of law provision that encompasses all matters arising out of

or relating to an agreement extends to tort claims." *In re Peierls Fam. Inter Vivos Trusts*, 59 A.3d 471, 483 (Del. Ch. 2012), *aff'd*, 77 A.3d 249 (Del. 2013).

Section 11 is such a provision. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). "[R]elated thereto," NDA § 11, is likewise "quite broad," *Azima*, 926 F.3d at 877, requiring only that the dispute have "some 'logical or causal connection'" to the agreement, *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (quoting Webster's Third New International Dictionary 1916 (1971)); *see Gloucester Holdings Corp. v. US Tape & Sticky Prods., LLC*, 832 A.2d 116, 124 (Del. Ch. 2003). The stacked verbs, "governed, controlled, interpreted, and defined," NDA § 11, similarly suggest broad application, *see Sickle v. Torres Advanced Enter. Sols., LLC*, 2020 WL 5530357, at *11 (D.D.C. Sept. 14, 2020) (explaining that use of both "governed by" and "construed in accordance with" "extends [the clause's] applicability even further" to related tort claims); *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 467 (E.D. Va. 2016) (same as to "governed" and "construed"). Section 11's internal structure confirms that its drafters knew how to write narrowly and chose not to: it reaches "any action related" to the NDA, while the forum-selection clause in the very next line covers only "disputes under this Agreement." NDA § 11.[1]

As pleaded, Plaintiff's tort claims against Rivet bear a logical connection to the NDA.

[1] The authorities on which Plaintiff relies are inapposite, as they construed materially narrower clauses. The choice-of-law provision in *Minebea Co. v. Papst*, 377 F. Supp. 2d 34 (D.D.C. 2005), for example, stated "simply that '*[t]his Agreement* shall be governed by and interpreted in accordance with the Laws of New York,'" *id.* at 38 (citation omitted)—language expressly limited to the agreement itself. *See Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 107 (D.D.C. 2015) (concluding the same regarding provision stating, "[t]his . . . letter shall be governed by and construed in accordance with the laws of England").

Each claim either attacks the circumstances of the NDA's formation or rests on the misuse of materials exchanged under its protections. Count IV alleges that Rivet's assurance that it had no intention of developing competing hardware or software induced Plaintiff to enter the NDA and deliver samples and specifications covered by the NDA. Am. Compl. ¶¶ 25, 34, 92–99. Count V alleges that Rivet "accessed and misused" confidential information covered by the NDA's use and reverse engineering restrictions to build its competing product. *Id.* ¶ 107; NDA §§ 2, 18; *see* Am. Compl. ¶¶ 34–35, 71(a). And Count VII alleges a "common scheme" "to procure Kägwerks' confidential, proprietary, and trade secrets information and to misuse that information," *id.* ¶ 118, with overt acts including the reverse engineering of the NDA-protected D.O.C.K. Ultra samples, *id.* ¶¶ 35, 71(a). Accordingly, Delaware law governs Plaintiff's tort claims against Rivet.

Plaintiff's claims against Luke stand differently. "[C]hoice of law analysis is performed for each issue adjudicated," and "a different law can apply to different issues." *Hartley v. Dombrowski*, 744 F. Supp. 2d 328, 336 (D.D.C. 2010); *see Barimany v. Urb. Pace LLC*, 73 A.3d 964, 967 (D.C. 2013). Luke did not sign the NDA, and no party contends that the NDA's choice-of-law provision binds claims against him. Luke Mot. at 8 n.2. Nor has any party identified a conflict between D.C. law and the law of any other interested jurisdiction. *See In re APA Assessment Fee Litig.*, 766 F.3d 39, 51–52 (D.C. Cir. 2014). Absent such a showing, D.C. law applies "by default." *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992). D.C. law therefore governs Counts V, VI, and VII against Luke.

**B. Misappropriation of Trade Secrets**

In Count I, Plaintiff alleges that Rivet and Luke misappropriated its trade secrets by using the hardware and software designs underlying the D.O.C.K. solutions to build a competing product. Am. Compl. ¶¶ 59, 71–72.

Federal and D.C. law provide a cause of action to the owner of a misappropriated trade secret. 18 U.S.C. § 1836(b)(1); *see* D.C. Code §§ 36-402, 36-403. A trade secret is information that "the owner . . . has taken reasonable measures to keep . . . secret" and that "derives independent economic value . . . from not being generally known . . . and not being readily ascertainable through proper means." 18 U.S.C. § 1839(3); *see* D.C. Code § 36-401(4). Information disclosed to the public or generally known within an industry cannot constitute a trade secret. *See Taylor v. Babbitt*, 760 F. Supp. 2d 80, 86 (D.D.C. 2011). "After a patent has issued," for example, "the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret." *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004). A plaintiff must also describe with enough particularity those portions or features of its product that are not generally known by those in the industry. *See DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 78 (D.D.C. 2007). But "[e]ven if individual elements are known to the public, a trade secret can exist in a unique combination of those otherwise publicly available elements." *Id.*

Defendants argue that Plaintiff has not plausibly alleged the existence of a trade secret because its D.O.C.K. technology is disclosed in its patent, and several alleged trade secrets merely describe features generally known in the industry.[2] Rivet's Mot. at 6–8; Luke's Mot. at 6–8. The court disagrees.

Plaintiff enumerates more than 30 specific claimed secrets across various categories, including hardware specifications and design elements, software features and configurations, and

---

[2] The court takes judicial notice of Plaintiff's U.S. Patent No. 12,212,354, ECF No. 19-2, for the fact of its disclosures, *see* Fed. R. Evid. 201(b)(2); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (considering Patent and Trademark Office documents "appended to [the defendant]'s motion to dismiss and whose authenticity is not disputed" because "they are referred to in the complaint" and are "integral" to plaintiff's claim).

internal product roadmaps, alleging that these features and information constitute trade secrets to the extent they are not disclosed in its patent. Am. Compl. ¶¶ 16, 60, 67. Rivet argues that some of these items are disclosed in the patent, including a "modular chest mounted hinge system that provides a mounting point for a user display and touch interface" and a compute or radio device, *id.* ¶ 60(a)(i), and the "mechanism for connecting data and power signals between the compute/radio device and the user display," *id.* ¶ 60(a)(ii). Rivet's Mot. at 7–8. Indeed, the patent describes a wearable command center built from a chest-mounted base, a clip that holds a display such as a smartphone, a hinge assembly that connects the two and holds the display at an angle, and a connector cartridge that carries data and power between the display and a second device mounted on the base. U.S. Patent No. 12,212,354 col. 6 ll. 9–36; *see id.* col. 7 ll. 15–40.

But most of Plaintiff's enumerated trade secrets do not appear in the patent at all. The patent describes the physical structure of a docking system; it says nothing about the software features and configurations Plaintiff lists, Am. Compl. ¶ 60(b), or about Plaintiff's internal product roadmaps, *id.* ¶ 60(c). As to features that appear generic, such as integrated Wi-Fi, USB power delivery, and video compression, *see* Luke's Mot. at 7, "a trade secret can exist in a combination of characteristics each of which, by itself, is in the public domain," where the "unique combination . . . adds value," *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 9 (D.D.C. 2004) (cleaned up). Plaintiff alleges that its protected secrets include the "configurations" of its hardware and software. Am. Compl. ¶ 60(a)–(b). Taken together, Plaintiff's allegations plausibly describe protectable information that falls outside the patent's disclosures and general industry knowledge.

Dismissal is therefore not appropriate as to Count I.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count III, Plaintiff alleges that Rivet breached the implied covenant of good faith and fair dealing by misusing Plaintiff's confidential information to build a competing product. Am. Compl. ¶ 88.

The implied covenant of good faith and fair dealing requires each party to a contract to "refrain from arbitrary or unreasonable conduct" that prevents the other "from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (cleaned up). It is "a limited and extraordinary legal remedy" whereby the court "infer[s] contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125, 1128 (Del. 2010). The covenant applies "only where a contract is silent as to the issue in dispute." *AQSR India Priv., Ltd. v. Bureau Veritas Holdings, Inc.*, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009). "Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

Plaintiff's implied-covenant claim impermissibly duplicates its breach-of-contract claim and targets conduct covered under the NDA. Plaintiff alleges, as a breach-of-contract claim, that Rivet breached the NDA "by using Kägwerks' Confidential Information to develop a competing edge-computing and communications product under the Rivet brand." Am. Compl. ¶ 83. Count III is nearly identical, alleging that Rivet breached the implied covenant by "misusing Kägwerks' Confidential Information to develop a competing edge-computing and communications product under the Rivet brand." *Id.* ¶ 88. The NDA expressly limits Rivet's use of confidential information to "evaluating or pursuing a business relationship between the parties" and prohibits reverse engineering and creating "other works" from Plaintiff's hardware, software, and samples. NDA

§§ 1, 2, 18.

Plaintiff's claim that Rivet undertook those actions "unreasonably, arbitrarily, in evasion of the spirit of the bargain, and without good faith," Am. Compl. ¶ 88, does not save it. If the complaint is that Rivet used confidential information to build a competing product, the NDA's express terms govern. And to the extent Plaintiff posits a freestanding implied promise not to compete at all, *see* Pl.'s Opp'n at 10–11, it asks the court to imply a covenant the parties never negotiated. The implied covenant "is not . . . a license for the court to rewrite the contract," *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 253 (Del. 2026) (cleaned up), and cannot supply protections Plaintiff failed to secure at the bargaining table, *see Nemec*, 991 A.2d at 1128.

Count III will therefore be dismissed without prejudice.

**D. Fraud**

In Count IV, Plaintiff alleges that Rivet, by misrepresenting and concealing its intention to build a competing product through misappropriation of Plaintiff's confidential information, fraudulently induced Plaintiff to enter the NDA and disclose its confidential samples. Am. Compl. ¶¶ 92–99.

Under Delaware law, common-law fraud requires "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *Johnson & Johnson*, 352 A.3d at 269 (quoting *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)). When a fraud claim is pleaded alongside a breach-of-contract claim, the court must ask "whether

the fraud claim rests on a duty imposed by law that is separate from the parties' contractual obligations, and whether it seeks damages that are qualitatively different from those available for breach of contract." *WIA Holdings LLC v. Scot. Am. Cap. LLC*, 2026 WL 1204494, at *13 (Del. Ch. Jan. 20, 2026). "Failure to plead separate damages is an independent ground for dismissal." *Yu v. GSM Nation, LLC*, 2018 WL 2272708, at *16 (Del. Super. Ct. Apr. 24, 2018); *see EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 (Del. Super. Ct. Mar. 13, 2017) ("Even if one were to assume . . . that EZLinks's two claims are distinct, it still must plead separate damages."); *Cont'l Fin. Co. v. ICS Corp.*, 2020 WL 836608, at *3 (Del. Super. Ct. Feb. 20, 2020) (same).

Plaintiff's fraud damages allegations impermissibly "rehash" those allegedly caused by the breach. *Yu*, 2018 WL 2272708, at *16. Count IV seeks "compensatory damages [Plaintiff] has sustained and will sustain from Rivet's fraud and deceit," Am. Compl. ¶ 102, the same relief Count II seeks for the breach of the NDA, *id.* ¶ 85. The prayer for relief confirms the overlap, requesting one undifferentiated award of "compensatory damages for harm caused by the defendants' breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and tortious interference." *Id.* at Prayer for Relief ¶ (c). The only relief unique to the fraud claim is the request for "punitive/exemplary damages," *id.* at Prayer for Relief ¶ (d), but under Delaware law, the "mere addition of punitive damages to [a] fraudulent inducement charge is not enough to distinguish it from the contract damages." *EZLinks*, 2017 WL 1312209, at *6; *see WIA Holdings*, 2026 WL 1204494, at *14 ("[A]llowing punitive damages to serve as the sole distinction would permit Plaintiff to circumvent contractual remedies and limitations simply by relabeling a breach of contract.").

Count IV will be dismissed without prejudice.

**E. Tortious Interference with Prospective Business Advantage**

In Count V, Plaintiff alleges that Rivet and Luke, by accessing and misusing confidential information to develop a competing product, tortiously interfered with Plaintiff's prospective business with the PEO programs and comparable foreign programs. Am. Compl. ¶¶ 104–08. As explained above, Delaware law governs this claim against Rivet; D.C. law governs the claim against Luke. The dispositive questions under both laws are the same: a plaintiff must show (1) a reasonably probable business opportunity or expectancy, (2) the defendant's intentional interference with it, (3) causation, and (4) resulting damages. *See Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001); *Browning*, 292 F.3d at 242.

Defendants challenge the first element, arguing that Plaintiff failed to allege a reasonable probability of a business opportunity between it and a third party. *See* Rivet's Mot. at 14–15; Luke's Mot. at 9–10. This argument is unavailing. D.C. law requires that the future contractual or economic relationship be "commercially reasonable to anticipate," *Browning*, 292 F.3d at 242 (quoting *Whelan v. Abell*, 953 F.2d 663, 673 (D.C. Cir. 1992)); Delaware law similarly requires a reasonable inference that "a specific party . . . was prepared to enter into a business relationship," *You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *9 (D. Del. Jan. 12, 2021) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)). Plaintiff alleges that its D.O.C.K. solution was "selected by the [PEO] . . . as the preferred platform for body-worn computing modules" for two ongoing programs, the PdM IVAS/SBMC and Nett Warrior, to which Plaintiff was already supplying hardware. Am. Compl. ¶¶ 3, 15, 54, 104. An incumbent supplier whose product is the designated preferred platform for ongoing procurement programs has plausibly alleged a reasonable probability of future awards from those programs.

Luke also challenges the intent element. Under D.C. law, "a general intent to interfere or

knowledge that conduct will injure the plaintiff's business dealings is insufficient"; the plaintiff must make a "'strong showing of intent' to disrupt ongoing business relationships." *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995) (quoting *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1988)). Luke argues that Plaintiff alleges only a general intent to compete, not to engage in the "egregious" conduct—such as "libel, slander, physical coercion, fraud, misrepresentation, or disparagement"—that D.C. law requires. Luke's Mot. at 9 (quoting *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 857 F. Supp. 2d 97, 104 (D.D.C. 2012)). But the Amended Complaint permits a reasonable inference of precisely such improper means. Plaintiff alleges that Luke "accessed and misused . . . confidential information" to help Rivet develop a competing product. Am. Compl. ¶ 107. Specifically, Luke allegedly abused his position as a government employee to provide Rivet access to Plaintiff's confidential submissions, "directed Rivet to incorporate specific features of Kägwerks' solutions," and steered Rivet to build a product that "mimicked" the D.O.C.K. solution, all as part of a scheme to "displace" Plaintiff, *id.* ¶¶ 37–39. Misuse of a competitor's confidential and proprietary information to supplant it is precisely the kind of wrongful conduct that separates an actionable interference from "the ordinary course of business." *Bennett*, 45 F.3d at 499.

Finally, Rivet argues that Plaintiff fails to allege that "any specific prospective business was 'dissuaded' from pursuing a relationship with Kägwerks as a proximate result of Defendants' alleged conduct." Rivet's Mot. at 15 (quoting *Biomeme, Inc. v. McAnallen*, 2021 WL 5411094, at *5 (Del. Super. Ct. Nov. 10, 2021)). Not so. Plaintiff alleges that Rivet obtained $55 million in funding specifically "to develop a competing solution to displace" Plaintiff's D.O.C.K. technology and then captured a nearly $200 million SBMC-program award, and as a result, Plaintiff's awards and selections were "terminated or lost." Am. Compl. ¶¶ 39, 46, 108. At the pleading stage, the

reasonable inference is that the PEO's selections were diverted to Rivet's misappropriation-derived product.

Dismissal is therefore not appropriate as to Count V.

**F. Tortious Interference with Contract**

In Count VI, Plaintiff alleges that Luke induced Rivet to breach the NDA by misusing Plaintiff's confidential information to develop a competing product. Am. Compl. ¶¶ 111–14. "[T]he tort of intentional interference with contractual relations requires a plaintiff to prove that the defendant intentionally induced an actual breach of contract that resulted in damages." *Grandison v. Wackenhut Servs., Inc.*, 585 F. Supp. 2d 72, 76 (D.D.C. 2008) (citing *Paul v. Howard Univ.*, 754 A.2d 297, 308–09 (D.C. 2000)). "In order to state a claim, a plaintiff . . . is required to plead affirmative, intentional acts of interference." *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 176 (D.D.C. 2016).

Luke argues that Plaintiff has failed to sufficiently allege that he intentionally induced Rivet to breach the NDA by disclosing Plaintiff's confidential information to third parties. Luke's Mot. at 11. That argument rests on an artificially narrow reading of the NDA. The NDA does not merely prohibit disclosure; it obligates Rivet to "use the Confidential Information of the Disclosing Party for no purpose other than the Permitted Use"—evaluating or pursuing a business relationship with Plaintiff—and expressly prohibits Rivet from "modify[ing], reverse engineer[ing], decompil[ing], creat[ing] other works from, or disassembl[ing]" Plaintiff's hardware, software, prototypes, and samples. NDA §§ 2, 18. The Amended Complaint alleges that Luke, while still at PEO, told Rivet that it "would need to create its own solution that mimicked" Plaintiff's D.O.C.K. technology, Am. Compl. ¶ 37, "[p]rovided Rivet with access to Kägwerks' confidential and proprietary information otherwise unavailable to Rivet," "[d]irected Rivet to incorporate

specific features of Kägwerks' solutions into Rivet's competing product," and "[i]nstructed Rivet to build a solution in the same form and with the same functions" as the D.O.C.K. solutions, *id.* ¶ 38(b)–(d). Rivet then allegedly reverse engineered or otherwise used the samples to create its own competing system. *Id.* ¶¶ 35, 71(a). Those allegations support an inference that Luke induced Rivet to breach the NDA: he allegedly directed Rivet to build a product that replicated Plaintiff's D.O.C.K. solutions, and Rivet allegedly did so by reverse engineering or otherwise using the NDA-protected samples, a competitive purpose the NDA expressly forbids.[3] Dismissal is therefore not appropriate as to Count VI.

**G. Civil Conspiracy**

In Count VII, Plaintiff alleges that Rivet and Luke entered a common scheme to procure and misuse Plaintiff's confidential, proprietary, and trade secret information to develop a competing product, and that each is vicariously liable for the resulting torts. *See* Am. Compl. ¶¶ 117–20. Delaware law applies to the claim against Rivet, and D.C. law applies to the claim against Luke. Under Delaware law, civil conspiracy requires "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149–50 (Del. 1987). D.C. law requires "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). Under both jurisdictions'

[3] Luke is correct on one point of scope: his conduct after he joined Rivet as an employee in May 2025, Am. Compl. ¶ 41, cannot support the claim, because once he became Rivet's agent, his conduct was Rivet's, and Rivet "could not tortiously interfere with its own contract." *Press v. Howard Univ.*, 540 A.2d 733, 736 (D.C. 1988).

law, "[c]ivil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009) (quoting *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 334 (D.C. 2007)); *see Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998). "A claim for civil conspiracy thus fails unless the elements of the underlying tort are satisfied." *Nader*, 567 F.3d at 697; *see Empire Fin. Servs. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006).

Defendants' principal contention—that no predicate tort survives—fails for the reasons explained above. Misappropriation of trade secrets and tortious interference with prospective business advantage serve as predicates for civil conspiracy against both Rivet and Luke; tortious interference with contract serves as an additional underlying tort against Luke.

Nor does the claim fail under the "intracorporate conspiracy doctrine," which "holds that . . . a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 739 (D.C. 2000) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000)); *see Am. Cap. Acquisition Partners, LLC v. LPL Holdings, Inc.*, 2014 WL 354496, at *12 (Del. Ch. Feb. 3, 2014). Defendants are correct that once Luke became Rivet's employee in May 2025, the two could not, as a matter of law, conspire with one another. *See* Rivet's Mot. at 17; Luke's Mot. at 14. But the Amended Complaint alleges that the agreement between Rivet and Luke was formed, and nearly all of the overt acts in furtherance of it were committed, while Luke was still a PEO employee, including the 2024 agreement to develop a mimicking product, Luke's meetings with Rivet reviewing confidential specifications, his direction to incorporate certain product features, the misuse of the NDA samples, and the joint effort to secure development funding. Am. Compl. ¶¶ 36–39. Count VII therefore may proceed

to the extent it rests on conduct before Luke became Rivet's agent in May 2025.

Rivet additionally argues that the claim fails because Plaintiff pleads no "separate damages specifically ascribed" to the conspiracy as distinct from its other counts. *See* Rivet's Mot. at 16 (quoting *AmeriMark Interactive, LLC v. AmeriMark Holdings, LLC*, 2022 WL 16642020, at *13 (Del. Super. Ct. Nov. 3, 2022)). While the Delaware Supreme Court does not appear to have addressed this question, it has made clear that the function of civil conspiracy under Delaware law is to hold each conspirator "jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy," *Nicolet*, 525 A.2d at 150—in this case, Rivet for Luke's conduct while at PEO, and Luke for Rivet's misuse of the NDA materials. Because the claim is derivative rather than a freestanding tort, the court is not persuaded that the "actual damage" element under Delaware law demands distinct conspiracy damages in addition to those flowing from the predicate torts. *Cf. Empire Fin. Servs.*, 900 A.2d at 97 (holding that plaintiff was "entitled to be compensated for the harm caused by the tortious act committed in furtherance of the conspiracy"); *Gannett Co. v. Irwin*, 1985 WL 189242, at *3 (Del. Super. Ct. Aug. 9, 1985) (explaining that damages element requires "damages proximately resulting from unlawful, overt acts"); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984). Plaintiff pleads a concrete injury from the alleged scheme—diversion of PEO program funding and awards to Rivet's competing product. *See* Am. Compl. ¶¶ 39, 46, 108, 120. That is sufficient at this stage.

Dismissal is therefore not appropriate as to Count VII.

## IV. CONCLUSION

For the foregoing reasons, Rivet's Partial Motion to Dismiss, ECF No. 19, will be GRANTED IN PART and DENIED IN PART. Counts III and IV will be dismissed without prejudice. The motion will be denied as to Counts I, V, and VII, and Luke's Motion to Dismiss,

ECF No. 20, will be DENIED. A separate order will follow.

Date: September 24, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge